FILED
2009 Nov-23  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| VANESSA A. FELDER, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:08-cv-1342-JHH |
| BRADFORD HEALTH SERVICES, d/b/a ADDICTION & MENTAL HEALTH SERVICES, | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OF DECISION

The court has before it the August 5, 2009 motion (doc. #49) of defendant/counterclaim plaintiff Addiction & Mental Health Services, Inc. d/b/a Bradford Health Services[1] ("Bradford") for summary judgment. Pursuant to the court's August 21, 2009 order (doc. #51), the motion was deemed submitted, without oral argument, on September 18, 2009. Having considered the briefs and evidentiary submissions, the court finds that defendant's motion for summary judgment as to plaintiff's claims is due to be granted for the reasons outlined below. The motion is due to be denied, however, as to defendant's counterclaims against plaintiff.

---

[1] Defendant was incorrectly designated in the Complaint as Bradford Health Services d/b/a Addiction and Mental Health Services.

# I. Procedural History

On July 28, 2008, Plaintiff Vanessa A. Felder filed a complaint (doc. #1) in this court against Bradford, her former employer, alleging: (1) Title VII disparate treatment on the basis of race (Count One); (2) 42 U.S.C. § 1981 disparate treatment on the basis of race (Count Two); (3) Title VII hostile work environment on the basis of sex (Count Three); (4) retaliation under Title VII and 42 U.S.C. § 1981 (Count Four); (5) breach of contract (Count Five); and (6) fraud (Count Six). In response to a motion to dismiss (doc. #4) filed by Bradford, the court dismissed the Title VII claims contained in Counts One, Three and Four and dismissed the breach of contract claim contained in Count Five. (Doc. #10.) Further, the court struck the fraud claim, as written in the original complaint, and allowed plaintiff time to file a more definite statement of the fraud claim. (Id.)

On October 20, 2009, Felder filed an amended complaint (doc. #11) alleging: (1) 42 U.S.C. § 1981 disparate treatment on the basis of race; (2) retaliation under 42 U.S.C. § 1981; and (3) fraud. On November 3, 2009, Bradford filed an answer and counterclaim (doc. #12), alleging tortious interference with business or contractual relations and defamation. Felder answered (doc. #13) the counterclaim on November 24, 2009. Finally, on April 16, 2009, Bradford filed, with leave of court, an amended

answer and counterclaim, to assert an affirmative defense of intentional, reckless, or negligent destruction of evidence.  (See docs. #41 & 43.)

Defendant's August 5, 2009 motion (doc. #49) for summary judgment asserts that no genuine issue of material fact exists and that Bradford is entitled to judgment as a matter of law as to all claims asserted against it by Felder and as to its counterclaims.  Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted evidence[2] in support of its own motion for summary judgment and filed a supporting brief (doc. #50) on August 5, 2009.  On September 11, 2009, plaintiff filed a brief (doc. #53) and evidence[3] (doc. #52) in opposition to defendant's motion for summary judgment.  On September 18, 2009, defendant filed a brief in reply (doc. #54) to plaintiff's opposition.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

[2] The defendant submitted the following evidence: affidavit of Roy Ramsey; deposition of Vanessa Felder with exhibits; defendant's first requests for production to plaintiff; and 6/29/2009 letter from defendant's counsel to plaintiff's counsel.

[3] The plaintiff submitted the following evidence: deposition of Vanessa Felder; personnel evaluations of Vanessa Felder; 6/19/2003 letter from former patient regarding Felder; 5/4/2004 supervision session for Felder.

and that the moving party is entitled to judgment as a matter of law." <u>Celotex Corp.</u> <u>v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 323. After the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. <u>See</u> <u>id.</u> at 324.

The substantive law will identify which facts are material and which are irrelevant. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. <u>See</u> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. <u>See</u> <u>id.</u> at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving

party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[4]

Bradford provides alcohol and drug abuse treatment services. (Ramsey Aff. ¶ 2.) Bradford operates  through out-patient offices in various locations and in-patient

---

[4]   These are the facts for summary judgment purposes only.  They may not be the actual facts.  See <u>Cox v. Administrator U.S. Steel & Carnegie</u>, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See <u>Fitzpatrick</u>, 2 F.3d at 1115.

facilities located in Jefferson County and Madison County, Alabama. (Id.) Felder, a former employee of Bradford, has been employed on two different occasions by Bradford.  She was first employed by Bradford from 1991 until 1997, where she worked as a counselor and case manager.  (Id. ¶ 3.) Felder was terminated in June 1997 for failure to maintain sobriety requirements. (Id.) In August 1998, however, she was rehired to work as a crisis response consultant. (Id. ¶ 4.) At the time, Bradford required only one year of sobriety, and Felder satisfied this requirement. (Id.)

A few months after her rehire, Felder was promoted to case manager. (Id.) In May 2000, her title was changed to Patient Services Coordinator, a position that was created specifically for Felder.  (Id.; Felder Dep. at 127-131.) As a Patient Services Coordinator, Felder's duties included (1) establishing and maintaining contact with referral sources; (2) contacting and updating employers, employee assistance programs, attorneys and court referral officers; and (3) resolving concerns of patients, family members, and referral sources. (Id. ¶ 5; Felder Dep, Ex. 8.)  Roy Ramsey was her direct supervisor, and Felder worked at Bradford's Warrior Lodge facility.[5] (Id. ¶¶ 6-8; Felder Dep. at 105-06, 130-31.)

_____

[5] Bradford has two residential facilities where a liaison between the patient and family or third parties would be required: Warrior Lodge and Madison. (Ramsey Aff. ¶ 15.) Only the Warrior facility, where Plaintiff was employed, had a Patient Services Coordinator. (Id.) The Madison facility has never had a Patient Services Coordinator and instead uses a model similar to that currently utilized by the Warrior facility for these duties. (Id. ¶ 5.)

### A. Alleged Unfulfilled Promises by Ramsey

Felder contends that Ramsey made two promises to her that were not fulfilled: that Bradford would reimburse Felder for her expenses after she received her MBA and (2) that her salary would be raised to $50,000 after completion of her MBA. As to the reimbursement promise, Felder testified that in the spring of 2005, Ramsey told her on a few[6] occasions that "Bradford would reimburse [her] for [her] graduate school expenses, if [her] degree was in healthcare." (Felder Dep. at 24.) Felder contends that Ramsey again assured Felder of this reimbursement in August 2006. (Id. at 28-30.) Ramsey denies making any such assurances. (Ramsey Aff. ¶ 11.)

Felder received her MBA, with an emphasis in healthcare management, from Regis University in December 2006. (Felder Dep. at 31.) Bradford has not reimbursed her for any costs associated with that degree. (Id.) Bradford contends, however, that Felder did not follow the correct procedures to be reimbursed. Felder never requested any reimbursement and did not meet the requirements in the Employee Manual. (Ramsey Aff. ¶ 10; Felder Dep. at 31-33.) As stated in the Employee Manual[7], Bradford offers eligible employees reimbursement for formal

---

[6] Felder testified Ramsey made these assurances more than three times, but less than six. (Felder Dep. at 23.)

[7] Felder acknowledged her receipt of Bradford's Employee Manual. (Exs. 5 & 6 to Felder Dep.) Moreover, Felder was aware of the procedure for claiming reimbursement for educational expenses because in 1999 she submitted a written request for reimbursement related to her

8

educational expenses if certain requirements are met, including: (1) pursue courses of study relating to degrees in the behavioral science field; (2) remain employed with Bradford for two years after graduation; (3) achieve a final grade of "B" or better for each course completed; (4) submit a Request for Tuition/Professional Status Reimbursement form at least two months prior to application, enrollment or registration; and (5) submit a Check Request form after successful completion of formal education course(s)/degree(s). (Ex. 4 to Felder Dep. at 47-49.) Felder does not dispute that she did not follow these procedures, although she maintains that she requested reimbursement from Ramsey, who would not discuss it with her. (See Pl. Br. at 4-5; Felder Dep. at 32-33.)

As to the salary increase, Felder testified that she "was promised that [she] would be increased to fifty thousand dollars when [she] got [her] MBA." (Felder Dep. at 225.) As stated above, Felder received her MBA in December 2006. (Felder Dep. at 225.) Although Bradford contends that her base salary was raised to $50,470 in November 2006,[8] Felder disputes this contention. (Ramsey Aff. ¶ 9; Felder Dep.

studies at the University of Montevallo. (Ex.7 to Felder Dep.)

[8] The court notes that although Bradford submitted an affidavit of Ramsey stating that Felder's salary was $50,470 in November 2006, it did not submit any pay records reflecting Felder's salary to support this statement. Such records would have supported Ramsey's statement to such an extent that no reasonable jury could believe Felder's claims regarding her salary. See Scott v. Harris, 127 S. Ct. 1769, 1776 (2007). However, because no records were introduced, the court must treat Ramsey's testimony as a disputed fact and accept Felder's

9

at 226-27.)  She testified that at this time her salary was around forty-six thousand dollars and any extra income would have been "bonus money" from the extra work she did during a utilization review.  (Felder Dep. at 226.)

## B. Complaints of Discrimination

Felder testified that in February or March of 2005, she spoke with Sydnee Bender, the director of Human Resources, about the fact that she did not receive a raise that she had been promised.  (Id. at 233-34.)  Felder did not, however, tell Bender that she believed the denial of her raise was on account of discrimination.  (Id. at 234.)  Instead, she was complaining of something she perceived as "unfair."  (Id. at 234-35.)

However, in late 2005, Felder testified that she did begin reporting allegations of discrimination.  In October 2005, Felder contends that she complained to Ramsey about the reassignment of some of her job duties by Tim DeLoach, Felder's manager. (Felder Dep. at 218.)  She stated that she told Ramsey that she was going to go to the EEOC because she felt like she was being discriminated against because of her race regarding the reassignment of those duties.  (Id. at 211-12, 218, 220.)  Felder contends that Ramsey said her in response "Do you know how many lives are going to be affected if you do that?"  (Id. at 212.)

_____

statements regarding her salary for purposes of summary judgment.

Felder testified that she complained to Ramsey a second time in March 2006 about the reassignment of her job duties by DeLoach.  (Id. at 219.)  She told Ramsey that she believed that she was being discriminated against on the basis of her race.  (Id. at 222.)  Ramsey encouraged Felder to go through Bradford's conflict resolution process.  (Id.)

Felder next approached Sydnee Bender about her complaints in late fall of 2006.  (Id. at 223, 235.)  Felder testified that she told Bender "about [her] duties being reassigned by Tim DeLoach.  And that [she] had talked to Roy [Ramsey]."  (Id. at 235.)  She also "mentioned a raise Molly Williams and Chuck Marshinke had received."  (Id. at 235-36.)   Regarding a raise, Bender told Felder to document why she deserved a larger raise.  (Id. at 236-37.) Felder does not recall whether she told Bender that she felt like she was being treated differently because of her race.  (Id. at 236-37.)

In December 2006, however, Felder did inform Bender of her belief that she was being discriminated against because of her race.  (Id. at 237-38.)  Felder testified that she spoke with Bender over the phone and their conversation was as follows:

> What I identified as the problem, my being discriminated against, my job duties were reassigned, white employees were getting raises.  I felt Mr. Ramsey was being unfair.  I had been told that he had not budgeted for raises larger than three percent, which I knew was not true because two employees had gotten huge raises, you know.

11

(Id. at 238.)  Felder stated that the conversation "became heated" because Bender

continued to tell her to go to Ramsey and to "pick [her]self up by the bootstaps," but

Felder had not gotten any results talking to Ramsey and knew she "had to go to

Sydnee to get any results."  (Id. at 239-40.)

### C. Elimination of the Patient Services Coordinator Position

In the fall of 2005, some of Felder's job duties began to be reassigned to the

primary counselors at the Warrior Lodge facility.  (Ramsey Aff. ¶ 12.)  Bradford

determined that it would be more efficient and cost effective for primary counselors

to perform some of the duties performed by the Patient Services Coordinator.  (Id.)

For instance, instead of having the Patient Services Coordinator serve as a liaison

between patients/counselors and third parties (including third-party payors,

employers, families, and courts), the patients' primary counselors could communicate

directly with the third parties. (Id.)

In February 2007, Bradford decided to completely eliminate the position of

Patient Services Coordinator held by Felder.  (Id.)  Bradford contends this decision

was made because of the increased efficiency of direct communication.[9]  (Id.)

Ramsey made the decision to eliminate Felder's position.  (Felder Dep. at 250.)

The elimination of this position and termination of Felder's employment was part of an overall reduction in force at Bradford.  During this time, Bradford needed to reduce costs.  (Ramsey Aff. ¶ 12.)  Bradford experienced a downturn in business from the loss of a major client, the psychiatric unit at Carraway Hospital.  (Id.)  Five other employees were also included in the February 2007 reduction in force: Chris Pointer,[10] a Crisis Response Coordinator at the  Boaz Outreach facility; Phaedra Turner,[11] a Counselor II at the  Warrior Lodge facility; Guy Walker,[12] Regional Director at the Boaz Outreach facility; Alanda Glanton,[13] an ECS/CRC at Carraway; and Virginia Rape,[14] a Crisis Response Consultant at the  Warrior Lodge facility. (Id.

---

[9] In addition, the number of patients that Bradford was treating at its Warrior location, where plaintiff was employed, had increased over the last several years. (Ramsey Aff. ¶ 12.) The Patient Services Coordinator position model, in general, became inefficient given the increased number of patients.  (Id.)

[10] Pointer is a white male.  (Ramsey Aff. ¶ 13.)

[11] Phaendra Turner is a black female.  (Id.)

[12] Guy Walker is a white male.  (Id.)

[13] Alanda Glanton is a black female.  (Id.)

[14] Virginia Rape is a white female.  (Id.)

¶ 13.)  In total, three white employees and three black employees were terminated as part of the RIF. (Id.)

Felder's position was completely eliminated in the reduction in force on February 23, 2007.  Her verbal communication responsibilities were assumed by the primary counselors , both black and white, and her paperwork duties were assumed by Mellonee Hall, a black female. (Id. ¶ 14.)  The medical records personnel at the Warrior Lodge facility assumed the duties of handling the paperwork associated with processing the FMLA and disability claims of Bradford's patients. (Id. ¶ 12.)  Felder did not apply for another position with Bradford after her termination. (Id. ¶ 14.)  Under Bradford policy, the submission of an application is a prerequisite to being considered for a position. (Id.)

The only other position for which Felder qualified when she was terminated was the crisis response intake position. (Id.) However, at the time of her termination, the number of crisis response consultants at the Warrior facility was also being reduced to cut costs.  (Id.)

### D.  Felder's Fraud Accusations

After her employment with Bradford, Felder accused Bradford of engaging in fraudulent billing practices.  (Ex. 18B to Felder Dep.; Ex. 20 to Felder Dep.)  Specifically, in an e-mail to the Alabama Department of Mental Health and

Mental Retardation ("DMH/MR")[15], she communicated to a representative from the DMH/MR that Bradford, among other things, had been committing insurance fraud. (Ex. 20 to Felder Dep.) In this correspondence, Felder claimed that she had "medical record numbers substantiating fraud as well (over 280 cases)[16]" and that she was going to contact the fraud and abuse offices of the insurance companies "that have paid Bradford for services not rendered." (Id.) Felder did just that and made similar representations to Blue Cross and Blue Shield of Alabama ("BC/BS") as well as the Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO").[17] In an August 23, 2007 e-mail to a representative of BC/BS, Felder accused Bradford of insurance fraud, reporting of false information to insurance case managers and false documentation. (Ex. 18B to Felder Dep.) She specifically stated in that e-mail

---

[15] DMH/MR is the state agency charged with monitoring compliance with the regulations promulgated by the DMH/MR. If Bradford is deemed noncompliant with these regulations, Bradford will lose its certification and could not continue to do business in Alabama. Felder was aware of these implications at the time she made her accusations. (Felder Dep. at 335-36; Pl.'s Answer to Counterclaim ¶ 5.)

[16] In her deposition, Felder testified that this number must be a "typo" because she only had "over a hundred cases." (Felder Dep. at 340-41.)

[17] BC/BS is one of primary insurers with which Bradford had a reimbursement arrangement for services and JCAHO is an independent organization that accredits hospitals. Without an accreditation, Bradford would not be able to receive reimbursement from most of the managed care organizations with which it does business. Felder was aware of these implications at the time she made her accusations. (Felder Dep. at 336, 341; Pl.'s Answer to Counterclaim ¶¶ 6-7.)

that she had documented over sixty cases of insurance fraud involving Bradford.[18]

(Id.)  Bradford denies these accusations, and contends that they have tarnished its reputation and have required Bradford to expend resources responding to the allegations. (Ramsey Aff. ¶ 16.)

## IV. Analysis

Felder's amended complaint contains the following three claims: (1) 42 U.S.C. § 1981 disparate treatment on the basis of race; (2) retaliation under 42 U.S.C. § 1981; and (3) fraud.  (Doc. #11.)  Additionally, defendant filed two counterclaims (doc. #12) against Felder: (1) tortious interference with business or contractual relations and (2) defamation.  Defendant contends that it is entitled to summary judgment on all plaintiff's claims and on its two counterclaims.  (Docs. # 49, 50.) The court first addresses each plaintiff's claims and then address defendant's counterclaims.

### A. Felder's Claims of Discrimination Fail as a Matter of Law.

---

[18] In her deposition, Felder testified that she had six pages of handwritten notes containing a list of over one hundred case numbers, documented while she still working at Bradford, that she contends contained evidence of insurance fraud.  (Felder Dep. at 275-88.)  The only document produced by Felder, however, is a one-page typed list of forty-five case numbers, produced before Felder's deposition in response to a request for production.  (See Ex. 18A to Felder Dep.)  Although Felder testified that she would produce the alleged handwritten notes to Bradford, she did not produce any such document, even after a specific request from Bradford after the deposition.  (See Def. Ex. D.)

In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  Here, Felder presents only circumstantial evidence of discrimination.  "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."[19] Combs v. Plantation Patterns, 106 F.3d 1519 1527 (11th Cir. 1997).  Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.[20]  See id. at 1527-28.  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise

---

[19] The Eleventh Circuit applies the same analytical framework to Title VII and § 1981 race discrimination claims.  See Cooper v. Southern Co., 390 F.3d 695, 724-25 (11th Cir. 2004).

[20] The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Bd. of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).

similarly situated employees outside the plaintiff's class were treated dissimilarly.[21]
See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555,
1562 (11th Cir. 1997) (discipline); see also Nix v. WLCY Radio/Rahall Commc'ns,
738 F.2d 1181, 1185 (11th Cir. 1984) (discipline); Pittman v. Hattiesburg Mun.
Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the
presumption of discrimination, the burden of production shifts to the employer to
articulate a legitimate, nondiscriminatory reason for its actions.  See Rojas v. Florida,
285 F.3d 1339, 1342 (11th Cir. 2002); Combs, 106 F.3d at 1528.  The employer
"need not persuade the court that it was actually motivated by the proffered reasons."
Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer
satisfies that burden by articulating one or more such reasons, then the presumption
of discrimination falls and the burden of production again shifts to the plaintiff to
offer evidence sufficient for a reasonable jury to conclude that the employer's
supposedly legitimate reason is merely a pretext for illegal discrimination.[22]  Id.

---

[21] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in
Title VII cases, and the specification above of the prima facie proof required from respondent is
not applicable in every respect in different factual situations.").

[22] If the proffered reason is one that might motivate a reasonable employer, a plaintiff
cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that
reason is not sufficient.  Chapman, 229 F.3d at 1030.

Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

Felder contends that she was discriminated against because of her race when (1) she was terminated as part of the reduction-in-force (RIF); (2) she did not receive reimbursement for her expenses in connection with her MBA; (3) she was not given a raise to $50,000 after receiving her MBA; and (4) her job duties were reassigned.[23] The court addresses each allegation of discrimination below.

### 1.  Termination

In the usual termination case, the prima facie case is commonly established by demonstrating that the plaintiff (1) was a member of the protected class, (2) was subject to adverse employment action, (3) was qualified to do the job, and (4) was replaced by an individual outside her protected class.  See Benson v. Tocco, Inc., 113 F.3d 1203, 1207-08 (11th Cir. 1997).  In a RIF case, like the one here, however, the plaintiff's job is eliminated in its entirety.  Requiring plaintiff to demonstrate that she was replaced by an employee outside her protected class thus serves no purpose.

---

[23] Although the complaint also mentions the fact that Felder was not allowed to travel as potential discrimination, she does not make any argument regarding this issue in her opposition brief, notwithstanding the fact that the defendant addressed it in its brief in support of summary judgment.  Therefore, the court deems this claim abandoned by plaintiff.  See Zivojinovich v. Barner, 525 F.3d 1059, 1062 n.1 (11th Cir. 2008) (failure to offer any argument on an issue in a brief abandons the issue).  In addition, plaintiff's opposition brief makes references to disparate discipline, but there is no such claim in the complaint.  Plaintiff may not assert a new claim at this point in the litigation.  See Gilmour v. Gates McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

Therefore, in a RIF case the plaintiff can establish a prima facie case of discrimination by establishing:

> (1) that [s]he was in a protected group and was adversely affected by an employment decision; (2) that [s]he was qualified to assume another position at the time of discharge or demotion;[24] and (3) evidence by which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.

Barnes v. Southwest Forest Industs., 814 F.2d 607, 609 (11th Cir. 1987) (citation omitted).

To establish the second element, the Eleventh Circuit requires the plaintiff to show that she was qualified for another position *available* at the time of discharge, Earley v. Champion Int's Corp., 907 F.2d 1077, 1082-83 (11th Cir. 1990), and that

---

[24] Much of the case law in the Eleventh Circuit articulates the second prong of the prima facie case as requiring plaintiff to prove an alternative: that she was qualified for her current position or to assume another position at the time of discharge. See, e.g., Jameson v. Arrow Co., 75 F.3d 1528, 1532 (11th Cir. 1996); Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331 (11th Cir. 1998); Earley v. Champion Intern.Corp., 907 F.2d 1077, 1082 (11th Cir. 1990). This alternative, however, was not in the original formulation of the prima facie case in RIF cases in the Eleventh Circuit. See Williams v. Gen. Motors Corp., 656 F.2d 120, 129 (5th Cir. Unit B 1981). Only the second half of the alternative, that she be qualified to assume another position at the time of discharge, was included. Id. As far as the court can tell from its research on this issue, the first half, that she be qualified for her current position, was introduced in a footnote in Rollins v. TechSouth, Inc., 833 F.2d 1525, 1532 n.14 (11th Cir. 1987).

When faced with an intra-Circuit split, such as the one noted here, the Eleventh Circuit requires that courts apply the "earliest case rule," meaning "when circuit authority is in conflict, a [court] should look to the line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel." Walker v. Mortham, 158 F.3d 1777, 1188 (11th Cir. 1998). Therefore, the court follows the earliest precedent, adopted by the Eleventh Circuit from the Fifth Circuit in Williams v. General Motors Corp., and uses the formulation cited above for the prima facie case in this RIF case.

the plaintiff actually *applied* for the available position.  Jameson v. Arrow Co., 75 F.3d 1528, 1532 (11th Cir. 1996).  There is no requirement that the employer "establish an interdepartmental transfer program during the course of a RIF" or the employer "transfer or rehire laid-off workers in the protected . . . group as a matter of course."  Id. at 1532-33 (citations omitted).  To establish the third element, intent, the plaintiff must offer evidence that could lead a fact finder to conclude that "(1) [the] defendant consciously refused to consider retaining a plaintiff because of h[er] [race], or (2) [the] defendant regarded [race] as a negative factor in such consideration."  Padilla v. North Broward Hosp. Dist., 270 Fed. Appx. 966, 971 (11th Cir. 2008) (unpublished) (quoting Allison v. Western Union Tel. Co., 680 F.2d 1318, 1321 (11th Cir. 1982)).

Although Felder satisfies the first element of her prima facie case, that she is in a protected class and was adversely affected by the employment decision, she cannot establish the second or third elements.  As to the second element, Felder did not present any evidence whatsoever that there was a position available for which she was qualified at the time of her termination or that she applied for *any* position at Bradford when she was terminated.  In fact, Felder did not even address this element of her prima facie case in her brief in opposition to summary judgment.  The only evidence before the court as to this element is from the defendant, showing that there

were no available positions for which Felder qualified at the time of her termination and that she did not apply for any other job at Bradford when she was terminated. (Ramsey Aff. ¶¶ 13, 15.)

As for the third element, Felder did not present any evidence of intent to discriminate.  The evidence shows that Bradford chose to eliminate Felder's position as part of the RIF because of its perception of gained efficiency and because of a downturn in business.  (Id. ¶ 12.)  The RIF included three white employees and three black employees.  (Id. ¶ 13.)  Additionally, after the RIF some of Felder's job duties were assigned to employees within her protected class.  A black female assumed all of her paperwork duties and her communication duties were assumed by the primary counselors who are both white and black.   (Id. ¶ 14.)  Further, Felder has not produced any evidence that Ramsey, who made the decision to eliminate Felder's position, held any animus toward African Americans.  As such, Felder has not shown that Bradford acted with any intent to discriminate.  See Padilla, 270 Fed. Appx. at 971-72; Earley, 907 F.2d at 1083; Hudson v. S. Ductile Casting Corp., 849 F.2d 1372, 1375 (11th Cir. 1988).

In summary, because Felder failed to establish the second and third elements of her prima facie case of discrimination, her claim that she was terminated because of her race fails as a matter of law.[25]

### 2.   Other Allegations of Disparate Treatment

As outlined above, in addition to her termination, Felder contends that she was treated differently because of her race in other areas of her employment with Bradford.   She argues that she was discriminated against when she was not reimbursed for expenses associated with obtaining her MBA, she was not given a promised raise after receiving her MBA, and her duties were reassigned.   "To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job."   Burke-Fowler v. Orange County, Fla., 447 F.3d

---

[25] Even if Felder could establish a prima facie case of discrimination with respect to her termination, she cannot establish pretext for the same reasons she could not establish the intent element of her prima facie case.  Additionally, plaintiff's other argument regarding pretext fails.  In the *one sentence* devoted to pretext in her brief, Felder contends "[a] jury could also rationally conclude that the Defendant's ability to provide raises when it supposedly needed to cut back to save money makes the termination of the Plaintiff pretextual." (Doc. # 53 at 12.)   Similar arguments have been rejected by the Eleventh Circuit.  For instance, in an age discrimination case, evidence that a defendant hired new, younger employees and gave raises to other employees around the time of the RIF was insufficient to establish pretext.  See J.A. Beaver v. Rayonier, Inc., 200 F.3d 723, 728 (11th Cir. 1999).

1319, 1323 (11th Cir. 2006) (citing EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000)).   Where evidence of similarly situated employees is unavailable, the plaintiff is required to produce other circumstantial evidence of discrimination to establish her prima facie case of disparate treatment.  See Holifield, 115 F.3d at 1562 (holding that "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." (emphases omitted)).

In the context of discrimination claims,[26] an adverse employment action is "a *serious and material* change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). To constitute a violation, "the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way."  Id. (citation omitted).   To determine whether an action constitutes a violation, "the

---

[26] The court notes that the Eleventh Circuit has consistently rejected the argument that the decision in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) applies to claims of disparate treatment discrimination.  The "materially adverse" standard in Burlington Northern was explicitly limited to claims brought under the anti-retaliation provision of Title VII, and the Supreme Court was careful to note that a different standard applied to substantive claims of discrimination. See id. at 67 (concluding that "Title VII's substantive provision and its anti-retaliation provision are not coterminous," and that the anti-retaliation provision forbids conduct not prohibited by the anti-discrimination provision). Therefore, the Eleventh Circuit continues to apply the standard articulated in Davis to claims of substantive discrimination under Title VII.

employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id.

### a. Reimbursement for MBA Expenses

Felder contends that she was discriminated against when Bradford refused to reimburse her for expenses related to obtaining her MBA. Bradford contends that Felder has failed to establish a prima facie case of discrimination because the denial of reimbursement for Felder's expenses related to her MBA is not an adverse employment action. (Doc. #50 at 26-27.) Bradford characterizes the reimbursement as a "discretionary bonus awarded to employees who met the requirements specified in the Employee Manual." (Id. at 27.) Felder does not respond to this argument or make any argument whatsoever regarding the prima facie case relating to her claim of discrimination relating to the reimbursement of her MBA expenses.[27] (See doc. #53 at 10-12.) The *three* sentences in her brief relating to this claim[28] are as follows, two of which are in the statement of facts section:

---

[27] The court is amazed at the lack of attention paid by plaintiff's brief to the claims she makes in her complaint. Plaintiff makes no effort whatsoever to address her claims using the McDonnell Douglas burden-shifting approach, nor does she even make coherent arguments addressing the contentions made by defendant. Instead, her argument section is a serious of self-serving assertions, with little to no citation to the record.

[28] She also provides one sentence regarding this claim in the section of her brief relating to her fraud claim. (See doc. #53 at 13.)

26

- "Plaintiff disputes that she did not request reimbursement for her tuition. Plaintiff contends that she requested the reimbursement from the final decision maker, Roy Ramsey, who would not discuss it with her. Felder Dep. pp. 32-33." (Id. at 4.)
- "The Defendant did not reimburse the Plaintiff for her graduate studies." (Id. at 6.)
- "The Defendant also discriminated against the Plaintiff by . . . defraud[ing] her out of . . . her tuition reimbursements." (Id. at 10.)

Even if the court regarded these three sentences as an actual argument (which it does not), plaintiff's claim fails as a matter of law. First, she failed to establish a prima facie case because, although she is a member of a protected class and was qualified to do her job, the denial of reimbursement for her expenses is not an adverse employment action. As stated above, the Eleventh Circuit has repeatedly stated that to constitute an adverse employment action, there must be "a *serious and material* change in the terms, conditions, or privileges of employment" that impacts "the plaintiff's job in a real and demonstrable way." Davis, 245 F.3d at 1239 (emphasis in original). The denial of reimbursement, especially when it is undisputed that she did not follow the procedures set out in the Employee Handbook to obtain reimbursement, does not impact the terms, conditions or privileges of her employment. She was not entitled to the reimbursement, as it was discretionary upon meeting the requirements in the handbook.

27

Second, Felder failed to introduce any evidence that other similarly situated employees outside her protected class were treated more favorably than she.  In fact, she did not identify any employees who were given a reimbursement for tuition, and she certainly did not identify an employee who failed to follow the procedures set out in the handbook, but was still given reimbursement.  Nor did Felder introduce any other evidence of discrimination in relation to the denial of reimbursement.  See Wilson, 376 F.3d at 1092.  As such, she failed to establish a prima facie case of discrimination with respect to the denial of reimbursement for her expenses related to her MBA.[29]

### b.  Denial of a Raise

Felder contends that Ramsey promised to raise her salary to $50,000 per year after she received her MBA in healthcare, and that Bradford's refusal to do so after she obtained her degree constitutes race discrimination.  Bradford argues that Felder's "pay allegations are curious" because it contends that "her 2006 salary was $50,470." (Doc. #510 at 27.)  However, as the court explained in footnote 8, supra, at this stage in the litigation, without proof of Felder's salary in the form of a definitive document,

---

[29] Plaintiff does not even attempt to make an argument regarding pretext relating to this claim, (see doc. #53 at 11-12), and the court will not do so for her.

the court must accept plaintiff's testimony regarding her pay, that she was making around $46,000 at the time.

As explained above,  Felder must show that: (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) Bradofrd treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job. See Burke-Fowler, 447 F.3d at 1323.    The plaintiff and the employee she identifies as a comparator must be similarly situated "in all relevant respects." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (quoting Holifield, 115 F.3d at 1562).  "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Id. (citing Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001)).

It is undisputed that Felder meets three of the four elements of her prima facie case.  She is a member of a protected class, was qualified to do the job, and the denial of a pay raise is an adverse employment action.  See Gupta v. Fl. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000).  Bradford contends, however, that Felder has failed to present any evidence of a similarly situated comparator.  The court agrees.

Although Felder neglects to address this element in her brief (nor does she address the prima facie case in general regarding this claim), she identified two

29

individuals in her complaint and during her deposition who received raises when she did not. She first points to Molly Williams who was given a raise in connection with her promotion to the position of Assistant Treatment Director. (Felder Dep. at 140-41.) Williams and Felder were not similarly situated, however. Williams's position required her to be a licensed counselor and her duties were drastically different than Felder's duties. (Id. at 140; Ramsey Aff. ¶ 17.)

Next, Felder points to Chuck Marschinke as a potential comparator. (Felder Dep. at 140-44.) Marschinke is a Community Marketing Representative, who has worked at Bradford for over twenty-four (24) years. (Ramsey Aff. ¶ 20.) His duties include national marketing and company-wide business development. (Id.) Felder admitted in her deposition that Marschinke was "significant in bringing in new business" to Bradford, but contends that she, too, brought in business to Bradford. (Felder Dep. at 143-44.) Felder has failed to present evidence that she was similarly situated to Marschinke. Although she had some marketing duties, from the small amount of evidence in the record regarding Marschinke (which was presented entirely by Bradford), the two jobs were different. Moreover, Marschinke had much more experience than Felder. See Jackson v. Bellsouth Telecommunications, 372 F.3d 1250, 1274-75 (11th Cir. 2004) (individuals must be similarly situated in all relevant

respects besides race . . . since "[d]ifferent treatment of dissimilarly situated persons does not violate" civil rights laws.)

Felder's failure to identify a comparator does not end the analysis of this discrimination claim, however.  As explained above, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present*."  Wilson, 376 F.3d at 1092 (quoting Holifield, 115 F.3d at 1562) (emphasis in Wilson).  Felder attempts to prove she was denied a raise because of her race in two ways.  She first argues that Bradford changed its story as to why it could not give her a raise. (Doc. #53 at 11-12.)  Felder contends that she was first told that there were insufficient funds for raises, but that Bradford now claims that she was denied a raise "because it was inconsistent with a policy that has not been previously mentioned."  (Id. at 11.)  She next argues that "the false statements regarding the lack of . . . ability to give Plaintiff the raise she had been promised, while giving large raises to other employees[30], constitutes evidence" of discrimination.  Both arguments fails.

Felder's argument that Bradford's story changed about the reason for the denial of a raise is belied by the record.  Bradford has never alleged or argued that Felder was denied a raise because she failed to follow a policy.  (See doc. #54 at 6.)  The

---

[30] The court assumes that Felder alleges that the raises were given to white employees.

court assumes that Felder is referring to the tuition reimbursement policy, and there is no evidence that this policy was related to the denial of Felder's raise.

Felder's second argument, that white employees were given raises when Felder was not, is also insufficient.  First, Felder does not specify which employees were given raises, other than stating that they were "white" and certainly has not produced any *evidence* of such raises, others than her self-serving assertion.  Second, the Eleventh Circuit has considered a similar argument in J.A. Beaver v. Rayonier, Inc., 200 F.3d 723 (11th Cir. 1999), where the plaintiff, who was terminated as part of a RIF, argued that the fact that his employer "cut jobs to reduce costs instead of cutting out bonuses and raises" was evidence of pretext.  Id. at 728.  The Eleventh Circuit rejected this argument stating that "the employer is free to choose whatever means it wants, so long as it is not discriminatory, in responding to bad economic conditions" because it is not the role of the court to second-guess the decisions made by the employer.  Id. (citing Combs, 106 F.3d at 1543).  Felder has failed to offer any evidence to show that the denial of her raise, as compared to the alleged raises to white employees, were a product of discrimination.  As such, her claim fails as a matter of law.

c.  Reassignment of her Duties

32

Bradford contends that Felder cannot establish a prima facie case with regard to the reassignment of her duties because the reassignment was not an adverse employment action. (Doc. # 50 at 26.)  Felder attempts to cast the removal of some of her job duties as a demotion. (Doc. #53 at 11.)  The duties that were reassigned related mainly to communication with patients and third parties.  Felder testified that the following duties were taken away from her:

- contact employers
- point of contact for referral sources
- involvement in Day-In Treatment
- attendance of staffing meetings
- therapist utilization review
- meet with all new patients
- handle complaints

(Felder Dep. at 215-16.)   These duties are what Bradford characterizes as her "communication duties" and they were reassigned to the primary counselors. (Ramsey Aff. ¶ 12.)  There is no evidence as to what percentage these reassigned duties took of Felder's work day, or whether they constituted primary duties or merely peripheral duties.  Felder, however, continued to do the following tasks, which were primarily paperwork and marketing:

- chart reviews
- after-hours utilization review
- all the marketing, including ordering all marketing supplies
- train marketing representatives

33

- met with patients leaving AMA
- disability papers[31]

(Felder Dep. at 216-17.)  Importantly, Felder's pay never decreased with the reassignment of these duties.  (Id. at 217.)

The evidence relating to the reassignment of some of Felder's job duties does not constitute an adverse employment action.  The Eleventh Circuit has cautioned that "applying the adverse action requirement carefully is especially important when the plaintiffs claim is predicated on his disagreement with his employer's reassignment of job tasks.  Courts elsewhere have been reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm." Davis, 245 F.3d at 1244-45 (citing  Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (agreeing with "other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes.") (citing, inter alia, Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 886-87 (6th Cir. 1996) and Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993).  The change in Felder's duties is simply not "so substantial and material that it does indeed alter the 'terms, conditions, or privileges' of employment." Id. at 1245.

_____

[31] This task was eventually reassigned as well. (Felder Dep. at 217.)

In the absence of any change to Felder's salary or benefits, or any significantly different responsibilities, the reassignment of some of her duties is simply insufficient under Eleventh Circuit precedent.   See id.; cf. McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1077-78 (11th Cir. 1996) (district court erred when it refused to submit verdict form allowing ADA plaintiff to recover for conduct short of termination where plaintiff alleged that he had been relieved of his supervisory duties, assigned to clean toilets as a janitor, and later reassigned to shipping department where he was expected to perform physical tasks difficult or impossible for him to complete).

Even if the reassignment of her duties was an adverse employment action, Felder failed to present any evidence of a similarly situated comparator or any other circumstantial evidence of discrimination to establish her prima facie case of disparate treatment.   See Holifield, 115 F.3d at 1562.  Felder failed to identify *any* specific nonminority employee of Bradford who was treated differently in other similar cases, nor does she make any generalized argument regarding any circumstantial evidence to establish her prima facie case.  Because she does not attempt to make any argument in her brief regarding these issues, the court refuses to do so for her.

Moreover, even if she did establish a prima facie case with regard to the reassignment of her duties, Felder's claim still fails. Felder does make an attempt at a pretext argument, and argues as follows, *in full*:

> Finally, a jury can also find that the Defendant's claims regarding the reassignment of Plaintiff's job duties was also pretextual.   The Defendant did not provide any explanation for the reassignment of the Plaintiff's job duties.  Felder Dep. p. 190.  Such a failure to provide reasoning for an adverse employment action constitutes evidence of pretext.

(Doc. #53 at 12) (case citation omitted). This argument distorts the record.  First, there is no evidence that Bradford did not provide an explanation to Felder regarding the reassignment of her duties.  The deposition page cited by the brief certainly does not support this contention and plaintiff has not pointed to any other evidence in support of it, other than her self-serving assertions in her brief.

Instead, Bradford introduced evidence that it began to reassign Felder's duties in an effort to create more efficiency and that efficiency, along with a downturn in business, ultimately led to the elimination of Felder's position.  (Ramsey Aff. ¶ 12.) Felder has simply failed to offer any evidence to rebut this legitimate, nondiscriminatory reason.  In fact, she has not offered any evidence whatsoever to even hint that the reassignment of her duties was because of her race.  Although she may believe that the reassignment was unfair or unwise, such belief does not mean

36

that discrimination took place.  The Eleventh Circuit has repeatedly stated that it does

not sit as a personnel board, judging the decisions of employers.  <u>Rowell v. Bellsouth</u>

<u>Corp.</u>, 433 F.3d 794, 798 (11th Cir. 2005) ("It is by now axiomatic that we cannot

second-guess the business decisions of employers.").  That is essentially what Felder

asks this court to do, and it refuses.  In sum, Felder's claim of discrimination as it

relates to the reassignment of her duties fails as a matter of law.

## B. Felder's Claim of Retaliation Fails as a Matter of Law.

A prima facie case of retaliation is established when the plaintiff demonstrates:

(1) that she engaged in statutorily protected activity; (2) that an adverse employment

action occurred; and (3) that the adverse action was causally related to her protected

activities.  <u>See Farley v. Nationwide Mutual Ins. Co.</u>, 197 F.3d 1322, 1336 (11th Cir.

1999); <u>see also</u> <u>Standard v. A.B.E.L. Servs.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998)

(noting that Title VII and § 1981 have the same requirements of proof and use the

same analytical framework) and <u>Shields v. Fort James Corp.</u>, 305 F.3d 1280, 1282

(11th Cir. 2002) (noting that courts properly apply cases from Title VII and § 1981

interchangeably).  To establish a causal connection, a plaintiff must show that the

decision-maker was aware of the protected conduct and that the protected activity and

the adverse action were not wholly unrelated.  <u>See</u> <u>id.</u> at 1377.  The causal link

element is generally construed broadly so that "a plaintiff merely has to prove that the

protected activity and the negative employment action are not completely unrelated."
Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). Thus, a "close
temporal proximity" between the plaintiff's protected conduct and an adverse
employment action generally is sufficient circumstantial evidence of a causal
connection for purposes of a prima facie case. See id.; see also Wascura v. City of
South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001); see also Maniccia v. Brown, 171
F.3d 1364, 1370 (11th Cir. 1999). Moreover, the Supreme Court has warned that
"mere temporal proximity between an employer's knowledge of protected activity and
an adverse employment action . . . must be 'very close.'" Clark County Sch. Dist. v.
Breeden, 532 U.S. 268, 273 (2001) (citations omitted).

As evidence of protected activity, Felder points to the conversation she had
with Sydnee Bender, the director of HR, in December 2006, where Felder allegedly
informed Bender of her beliefs that she was being discriminated against.[32] (See doc.
#53 at 11; Felder Dep. at 237-38.) This conversation clearly qualifies as protected
activity. Second, it is undisputed that Felder experienced an adverse employment
action when she was terminated on February 23, 2007.

---

[32] Felder does not base her retaliation claim on the conversations she had with Ramsey in
2005 and 2006. (See doc. #53 at 11.)

As far as the third element of her prima facie case, causal connection, Felder has established the requirement of temporal proximity, but just barely.  The Eleventh Circuit has stated that a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that three months between a protected activity and an adverse employment action standing alone was insufficient to establish a causal connection of retaliatory discharge).  The Court has held, however, that a seven-week gap is sufficiently close to establish a causal connection.  Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (ADA case). Here, the timing is a bit blurry - the protected activity occurred sometime in December 2006 and the termination occurred in late February.  Therefore, the time gap could be as close at two months or as far as three months, depending on when she spoke with Bender in December.  Giving Felder the benefit she deserves at summary judgment, the court will assume that she has produced evidence that her reports of discrimination was within a two month window before her termination.

Even giving Felder that benefit, the glaring problem with the third element of her prima facie case is not with temporal proximity; instead, it is a lack of evidence that the decisionmaker knew of her protected conduct.  To establish the requisite

causal link required as part of a prima facie case, at a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action.  Corbitt v. Home Depot U.S.A., 573 F.3d 1223, 1243 (11th Cir. 2009). The defendant's awareness of the protected statement may be established by circumstantial evidence.  Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993) (internal quotation marks and citations omitted). In the case of a corporate employer, "the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action." Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997).   This actual awareness requirement "rests upon common sense" since "[a] decisionmaker cannot have been motivated to retaliate by something unknown to him." Brungart v. BellSouth Telecommc'ns, Inc., 231 F.3d 791, 799 (11th Cir. 2000).   In addition, because retaliation requires actual knowledge on the part of the person making the decision, the knowledge of one who is not a decisionmaker cannot be imputed to the decisionmaker.  Id. at 800.

Moreover, "[c]ourts are wary of relying on weak circumstantial evidence to imply a decisionmaker's knowledge of protected expression." Corbitt, 573 F.3d at 1243.  In Brungart, for example, the Eleventh Circuit found that "temporal proximity

40

alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Brungart, 231 F.3d at 799.  "[W]hile [the Eleventh Circuit] ha[s] held that awareness of protected expression may be established based on circumstantial evidence, [the] cases have required plaintiffs to show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories." Raney, 120 F.3d at 1197. "Thus, a mere 'hunch' that an employee with knowledge of protected expression informed a decisionmaker of the protected expression does not constitute 'significant probative evidence' to avoid summary judgment." Corbitt, 573 F.3d at 1243 (citing Raney, 120 F.3d at 1198).

Here, Felder testified that Ramsey made the decision to terminate her.  (Felder Dep. at 250.)  There is absolutely no evidence in the record that Bender was a part of the termination decision or the decisions made as a part of the RIF, generally. Additionally, Felder has not presented any evidence whatsoever that Ramsey was aware of the conversation between Bender and Felder in December 2006.  Although Felder alleges in her statement of disputed facts that "Mr. Ramsey and Mr. DeLoach were aware of Ms. Felder's complaints to human resources . . ." (doc. #53 at 6), the citation to the record offered by Felder in support of that statement does not even suggest that Ramsey had any knowledge of her complaints to Bender in December

41

2006.  (See Felder Dep. at 223.)  Because there is no evidence that Ramsey knew of

the protected activity, Felder cannot establish that he was motivated by retaliation in

his decision to terminate her employment.  See Brungart, 231 F.3d at 799.  Therefore,

Felder has failed to establish a prima facie case of retaliation under § 1981, and her

claim fails as a matter of law.[33]

   *C.  Felder's Claim of Promissory Estoppel Fails as a Matter of Law.*

  Under Alabama law, "[a] claim of promissory fraud is 'one based upon a

promise to act or not to act in the future.' " Ex parte Michelin North America, Inc.,

795 So.2d 674, 678 (Ala. 2001) (quoting Padgett v. Hughes, 535 So.2d 140, 142 (Ala.

1988)).   To establish promissary fraud, the plaintiff must show the following:

> (1) a false representation (2) of a material existing fact (3) reasonably
> relied upon by the plaintiff (4) who suffered damage as a proximate
> consequence of the misrepresentation. To prevail on a promissory fraud
> claim ..., two additional elements must be satisfied: (5) proof that at the
> time of the misrepresentation, the defendant had the intention not to
> perform the act promised, and (6) proof that the defendant had an intent
> to deceive.

Id. at 678-79.  "[T]he law places a heavier burden in those fraud actions where one

attempts to prove fraud based on a misrepresentation relating to an event to occur in

the future.  Nat. Sec. Ins. Co. v. Donaldson, 664 So. 2d 871, 876 (Ala. 1995).

---

[33] Again, plaintiff makes no attempt at a pretext argument in her opposition brief
regarding the alleged retaliation, and the court refuses to make one fore her.

Felder alleges that Ramsey fraudulently promised her that Bradford would raise her salary to $50,000 a year and provide her with tuition reimbursements if she obtained her graduate degree in healthcare.  (Am. Compl. ¶¶ 7-8; Felder Dep. at 24.)  Her claim fails for several reasons, but the clearest one is that she has not produced any evidence of an intent to deceive on the part of Ramsey.[34]  "The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive."  Southland Bank v. A&A Drywall Supply Co., __ So.2d __, 2008 WL 5195187, at *11 (Ala. Dec. 12, 2008) (quoting Goodyear Tire & Rubber Co. v. Washington, 719 So.2d 774, 776 (Ala.1998)); see also Trum v. Melvin Pierce Marine Coating, Inc., 562 So.2d 235, 237 (Ala. 1990) ("for a promise to constitute a fraudulent misrepresentation, there must have been at the time the promise was made an intention not to perform, and such a promise must have been made with the intent to deceive.").  This burden cannot be met "merely by showing that the alleged promise was ultimately not kept; otherwise any breach of contract would constitute a fraud."  Goodyear Tire & Rubber Co., 719 So.2d at 776 (citation omitted).  "There must be substantial evidence of a fraudulent intent that existed when the promise was made."  Id.  Evidence of consistent, but unfulfilled, promises can in some cases amount to

---

[34] The court realizes that the defendant contests whether Ramsey made any such promises, but on a motion for summary judgment, the court must accept plaintiff's version of events.

substantial evidence of an intent to deceive.  Campbell v. Naman's Catering, Inc., 842 So.2d 654, 659 (Ala. 2002). Additionally, "[a] defendant's intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made." Byrd v. Lamar, 846 So.2d 334, 343 (Ala. 2002). However, misrepresentations made recklessly or innocently will not sustain an action for promissory fraud.  Graham Foods, Inc. v. First Alabama Bank, 567 So.2d 859, 862 (Ala. 1990) ("Reckless misrepresentation will not support a charge of promissory fraud."), and City of Prattville v. Post, 831 So.2d 622, 629 (Ala.Civ.App. 2002) (because promissory fraud required proof that the defendant did not intend to perform the act promised and had an intent to deceive, a claim of promissory fraud based on an implied or negligent representation "could not be sustained").

Felder has not presented any evidence even hinting at an intent to deceive.  For example, there is  no evidence of prior instances of unfulfilled promises by Ramsey to Felder or evidence of actions that occurred after the alleged promise by Ramsey that reflect on any intent to deceive.  Additionally, there is no apparent motive for Ramsey to deceive Felder.  Felder merely testified that Ramsey told her that Bradford would reimburse her if her degree was in healthcare and would raise her salary to

$50,000.  (Felder Dep. at 24.)  Such testimony is simply insufficient to establish that Ramsey intended to deceive Felder at the time he allegedly made the promises.[35]

In sum, viewing the evidence in the light most favorable to Felder, Felder did not present any evidence for a reasonable jury to conclude that Ramsey intended to deceive Felder.  Because there is no evidence of intent to deceive, Bradford is entitled to summary judgment as to Felder's claim of promissory estoppel.

D. *Bradford is Not Entitled to Summary Judgment on its Counterclaims.*

In response to the complaint filed against it by Felder, Bradford filed two counterclaims against her: (1) tortious interference with business or contractual relations and (2) defamation.  (Doc. #12.)  The court addresses each claim separately below.

1. Tortious interference with business or contractual relations

Bradford contends that Felder tortiously interfered with its business relationships when she contacted BC/BS of Alabama, DMH/MR, and JCAHO regarding her allegations that Bradford had, among other things, been committing insurance fraud.  (See doc. #50 at 42-43.)  Bradford alleges that Felder knew that

---

[35] Felder's argument in her brief regarding intent is based on alleged facts that are not supported by the record.  For instance, Felder contends that Bradford's "defense to its fraud claim ultimately rests on the contention that it changed its mind about giving Plaintiff the tuition reimbursement and raise."  (Doc. #53 at 13.)  The court is baffled by this statement as there is no evidence whatsoever to support it. In addition, the other arguments relating to the fraud claim are based on bald, self-serving assertions, instead of evidence in the record.

these allegations, if substantiated, could result in Bradford losing its certification, which allows Bradford to do business in Alabama, and losing its accreditation, which allows Bradford to be reimbursed by most of the managed care organizations with which it does business.  (Id. at 43.)

Under Alabama law, to establish tortious interference with contractual or business relations, a plaintiff must prove:

> (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relations; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of that interference.

S.B. v. Saint James Sch., 959 So.2d 72, 94 (Ala. 2006).  Although some Alabama case law lists a fifth element, the absence of justification for the defendant's interference, this element has been eliminated. See Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1153 (Ala. 2003) (citations omitted). Instead, justification for interference is an affirmative defense to be pleaded and proved by the defendant.  Id.  The court notes that Felder plead the affirmative defense of justification in her answer to the counterclaim.  (See Doc. # 13. Sixth Defense.)

Without delving deeply into the elements of this claim and the defense of justification, the court concludes that material questions of fact remain regarding

whether Felder intentionally interfered with the business relations of Bradford, and whether that interference was justified.  Felder contends that any interference was justified, but Bradford maintains that Felder failed to present evidence in support of her claims of fraudulent billing practives.  Although Felder failed to produce the documents she described in her communications regarding her claims of fraudulent billing practices, she maintained throughout her deposition and in her brief that she saw such evidence.  Additionally, Felder produced a one-page document containing a list of forty-five case numbers.  The evidence is simply too disputed to be appropriately handled on a motion for summary judgment.  Therefore, summary judgment is due to be denied as to Bradford's counterclaim.

## 2.  Defamation

Bradford contends that Felder "engaged in an effort to defame Bradford" when she communicated with DMH/MR, BC/BS and JCAHO regarding her allegations of, among other things, insurance fraud.  (See doc. #50 at 42-43.)  Bradford alleges that the representations she made were false and that during the discovery period in this case, Felder failed to produce any evidence to support her allegations that Bradford engaged in fraudulent billing practices.  (Id. at 43-44.)

Under Alabama law, to establish defamation, a plaintiff must show

> [1] that the defendant was at least negligent [2] in
> publishing [3] a false and defamatory statement to another
> [4] concerning the plaintiff, [5] which is either actionable
> without having to prove special harm (actionable per se) or
> actionable upon allegations and proof of special harm
> (actionable per quod).

Delta Health Group Inc. v. Stafford, 887 So.2d 887, 895 (Ala. 2004) (quoting Nelson

v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1091 (Ala. 1988)).  "A plaintiff usually

satisfies the publication element by proof of communication of the defamatory matter

to someone other than himself." Id. (quoting K-Mart Corp. v. Pendergrass, 494 So.2d

600, 602 (Ala. 1986)).

As with Bradford's other counterclaim, too many issues of fact remain on the

defamation claim for summary judgment to be appropriate.  For instance, as to the

third element, there is a question of fact as to whether the communications were false.

Bradford contends that the court must draw a negative inference from the lack of

production of documentation of the alleged fraudulent billing, but the court is

reluctant to do so on a motion for summary judgment, especially in light of the

plaintiff's testimony that she saw such evidence and the list of case numbers she did

produce.  Whether her statement was false and defamatory is a matter that should be

decided by a jury, not by the court as a matter of law.  As such, summary judgment

is inappropriate as to Bradford's claim of defamation.

## VI.  Conclusion

In summary, the court finds that no material issues of fact remain and that defendant is entitled to judgment as a matter of law as to all claims asserted by plaintiff.  Defendant is not entitled to summary judgment on its two counterclaims. A separate order will be entered.

**DONE** this the ___234d___ day of November, 2009.

_____

SENIOR UNITED STATES DISTRICT JUDGE

49